Appellant, Mr. Ekman for the Appellant, and Ms. Elkinson for the Appellant. Good morning. Good morning, Your Honors. If I may reserve three minutes for rebuttal. May it please the Court. Article 3 of the United States Constitution 9 and the 6th Amendment to the United States Constitution require that all criminal trials be tried in the state and the district where the crime occurred. It's not optional. It's mandatory. And when you look at Count 1 in this case, which is a conspiracy to money launder charge, in the indictment, there's no reference to anything happening in D.C. And I think what is astonishing about this case is that there's not a single piece of evidence anywhere in the record. After a multi-year investigation starting in 2014, 2015, after almost two years of pretrial proceedings, there's not a single piece of evidence in the record showing any kind of conspiratorial act in the District of Columbia. Nor does the government point to any in its opposition brief. What the government relies on for venue in Count 1 is Count 2's sting representation. The Court may recall that the sole act alleged in the entire indictment that's happening in D.C. consists of a November 2019 mix through Bitcoin fog by an IRS criminal investigator in the District of Columbia. That government agent is not a co-conspirator, I think by law and also by the fact that that agent is not listed in the government's bill of particulars listing conspirators. So that can't be the basis for Count 1's conspiracy to commit money laundering in the District of Columbia. Nowhere else in the record, anywhere, after a three-and-a-half-week trial, is there any evidence of any conspiratorial act, any conspiratorial communication, or anything in the District of Columbia. Mr. Sterlinghoff had—the agent sent a message about, you know, how could I trust and rely on Bitcoin fog that was not responded to. If—and this is—so this is clearly a hypothetical, but if Mr. Sterlinghoff had seen the message and responded to it and then sent—then everything's the same, sent the money. Yeah. Would that make a difference? Yes, I think it would make a huge difference. Would that make Venue proper in D.C.? Yes, I do think—yes, I think it would. But the real question for Venue— No, I'm sorry. No, I'm sorry. So the real question for Venue, it seems to me, is whether a reasonable jury could have concluded on this record that Mr. Sterlinghoff saw that message. I think for count two, and I think that's a fascinating question about count two, because when I did my research, I was—I looked for cases involving, you know, sting representations like you have here, where there wasn't any knowledge on the part of the defendant or any co-conspirator of the message, and I couldn't find one. Like, every case I look at, there's either knowledge on the part of the defendant or some sort of co-conspirator. What's fascinating about, I think, this case and why it almost looks like a law school exam is that there's no evidence that the message was ever seen or received. So my hypothetical—or my hypothetical now, if we ask—if we're focused on whether a jury could have found that he saw it and then the money was sent, that would be relevant to the conspiracy count as well, would it not? No, because that's not an act in furtherance of the— I thought I'd asked you if he had seen it and responded whether that would take care of the Venue issue, and I thought you said yes. Well, as the court knows, Venue has to be proper for each count. Okay, I'm sorry, because I thought you were talking—you were talking about the conspiracy count. Why wouldn't it be relevant to the conspiracy count as well if you—if the conspiracy is to operate this Bitcoin Fog business, and the whole premise of the way it works to obscure identities, whether privacy or to protect against prying investigative eyes, is that money comes in and gets mixed and lost in the shovel so nobody can identify which Bitcoin came in and which went out. And so it seems to me that everybody who puts—every time they accept more Bitcoin to come in, so every time those who organize Bitcoin have a situation where money is invited in, every payment in is part of advancing the conspiracy because it increases the size of the pool of Bitcoin funds that are shuffling around and shuffling around and obscuring identities. Well, the charge, as I understand it, is conspiracy to money launder and subsidies. It's the money laundering, money coming in, and if other people—if money didn't come in, you couldn't money launder. You'd have to have—I'm sorry, I'm calling it money. Bitcoin came in. You can't money launder unless there's lots and lots of Bitcoin coming in from different sources. But that—mixing per se is not illegal. At least that's what the district court said. So there's entirely legal, legitimate uses— No, I know there can be, but— —for mixers. For mixers, but not for Bitcoin fog. And so if its whole purpose was to—this is the jury termination here, that it was used for money laundering. Maybe not exclusively money laundering, but it was used for money laundering. And the way it was is Bitcoin comes in from many different sources. So when Agent Price's Bitcoin came in, it became part of the mix that obscured the identity of criminal Bitcoin that was coming in. But that's not an act in furtherance of— It seems to me it's an act essential to the conspiracy. If you don't have Bitcoin pouring in— No, because— —the money laundering can't work. Well, that's—well, Bitcoin fog was functioning without Agent Price's mix. Well, you can say that for any individual one. But for every individual, it is part of the plan is that we will have money—Bitcoin, again, coming in from multiple sources. And that's what will allow the mixing to obscure and hide those either who want their privacy and or those who, for legitimate reasons, those who want their privacy and identity hidden for illegitimate reasons, the money laundering. Yes, please. You can say that lots of times in conspiracies. A conspiracy would have kept going except for drug sale 12. It would have kept going. It was fine. That didn't really make it come or go. But every drug sale that contributes to a drug conspiracy is part of advancing that conspiracy. So to hear if the record—if the jury were to find that your client, Mr. Sterlinghoff, had seen that message and nonetheless sent Bitcoin to Mr. Price, then his contributions, that inviting that in and sending it back, sending new Bitcoin to him, would have advanced the conspiracy in that moment. I respectfully disagree on that just because the—Agent Price wasn't a co-conspirator, and nor was his conduct essential to— No, but it advanced the conspiracy of the others. There's a big question of what conspiracy. I don't think you can hang the charge warrants conspiracy to money launder on the mixing of roughly $86 of licit funds in 2019. I think that's a bit of a stretch, particularly when that $86 wasn't from a conspirator and wasn't essential conduct. I think what the Constitution requires for venue is that essential conduct to the crime charge occur in the district. Is it your view that essential conduct can only be illegal conduct? No, but it's— You can advance a conspiracy through a lawful act as well. Yes, you can. But here, when you have count two, what the crux of count two is is the representation. And you have a representation that there's—obviously, as this court knows, as we've been going through, there was no response to. And I think that's very problematic, but— I thought we were still on venue for count one and whether there was—and you had said that you need an act that's advancing the conspiracy. Well, the indictment, the superseding indictment, only mentions Agent Price's necks in count two. It doesn't mention it for count one. And, of course, the court knows you have to find venue proper on each count. And what's, again, astonishing to me is we're talking about Agent Price. But in all of this investigation, all of the evidence, when they seize Mr. Sterlingoff's three laptops, multiple terabytes of hard drives at the airport, his personal notes, a spreadsheet of all of his passwords to his Internet accounts, what's astonishing to me is not only is that there's nothing in there that references Bitcoin Fog anywhere, there's no direct evidence at all in this case. You don't have to have direct evidence. I mean, that sounds like a sufficiency argument, not a venue argument. It is a sufficiency argument because I think that bleeds over in relation to count two. But I think Agent Price's licit mix, you know, a sting where no one was stung, I think that's a really, it's being asked to do a lot more work than it can do. I haven't heard you, or to this point, talk about under the venue statute, it says that the prosecution for a conspiracy offense could lie not only where an act in furtherance of the conspiracy takes place, but where completed events takes place. And I guess just following up on Judge Millett's question, where the government's theory is that the money laundering is happening because cryptocurrency is being mixed, and there might be some mixing of licit funds with illicit funds to wash the money, so to speak. Why isn't a transaction involving licit funds part of the completed events of money laundering under that theory? I think because there's no evidence in the record actually of how Bitcoin Fog internally worked. And I think if you're going to reach that kind of factual conclusion, you can't do it on this record because the government never found the Bitcoin Fog servers. They produced no logs. They produced no internal communications related to Bitcoin Fog. If you speculate, which I think this entire case is based on, you can speculate that that's the way that Bitcoin Fog operated. But the fact of the record is they don't have any real evidence at all in the record of how it operated. So if we're going to make some sort of dispositive determination that this was a completed transaction under these terms, you have to fill in facts that aren't in the record. And I think that's the hallmark of this case. If you look at every conclusion in this case— There's facts that you're missing. There's descriptions of how it worked for purposes of money laundering. That is that there was concerted efforts to obscure identities, to make sure transactions were not traceable. And they did that in large part by mixing everything together when the Bitcoins came in so that the Bitcoins themselves could not be traced back to any individual. That's what they don't need to know. The jury doesn't need to look at the server. It doesn't need to read the computer code to understand how something worked. And there was testimony from Mr. Sterlingoff or Mr. Akamashti, a man or two, about the—whichever person, you know, the jury could find the thing—talking about how this was going to work. I don't understand why they have to find the servers. Well, if you're going to say that a crime occurred in D.C., I think you do need to have some kind of concrete evidence that something actually occurred. Or you run into the problem that in Internet cases, the venue clause simply will get erased. Because if this is the standard for venue in Internet cases, then any government agent just acting unilaterally from a keyboard can send a message to any website anywhere in the world that doesn't get a response and then get hailed in the court. He actually got a response. He got Bitcoin. That's the response. He actually got the service. He got the service, but the service was operating as it should be. He didn't get a response to the message. And again, count to— He got the service. He got the service. So business was—a business transaction with a D.C. presence was completed. But that doesn't meet the STING requirement of county's representational money laundering requirement. And I would—I would also be a little hesitant, I think. And I think this is one of the issues with, you know, computer cases. We're in such new territory. This is a matter of, I think, first impression. I think this is the first time this issue has ever been brought up in front of a court. Or to call that, you know, the receiving of Bitcoin a communication. And I think that's what the difficulty is that I'm having. Or a transaction. Let me focus you on venue for Count 3. And that's the federal money transmission licensing count. So I wonder if you have argued, even as—I know you've challenged venue, as we've just been talking about, for Counts 1 and 2. And I wonder if you've made a kind of alternative argument that even assuming that the jury and the district court correctly found that Bitcoin's—Bitcoin Fog's transaction with Agent Page was money laundering and a money laundering conspiracy occurring partly in D.C. So venue is established on Counts 1 and 2. Have you argued that Bitcoin Fog was nonetheless not a money service business required to register with FinCEN? Yes. I wish I liked to think I did. Where in your briefing did you make that argument? I know you've said no requirement to register because no transactions in D.C. But have you made any argument that even assuming transactions with D.C. may be a conspiracy occurring in part in D.C., nonetheless no requirement to register? I think that's made—I want to say in our reply brief and maybe in our opening brief where we essentially say he wasn't operating a business in D.C. I think one of the operative words in the statute that jumped out to me is business. It's not enough simply to have a one-off transaction. I think what happened here, there's three. Next is one in 2016. There's the one that we're talking about in Count 2, which is the only one where a message was sent. And there's one other one. I mean, if Bitcoin Fog— Did they take their cut? What? Bitcoin Fog took its cut out of every transaction, right? I think that's in the record, but— Yeah, there's no evidence that didn't happen with respect to Agent Price, Price's transaction. So that's—they got paid. What do you mean? Well, what's remarkable to me about this— It's operating like a business. Well, if it's a business, how come there's no business customers in the record? How come there's no users? Because that's the whole point of this scheme. I mean, really, the whole point of the money laundering scheme, all money laundering schemes, but especially this one, is to hide identities. To ensure there are no records by scrubbing the records on a regular basis. Then it seems a bit rich to come and say, no money laundering experience here, no business here, because there's no business records. That's the whole way this business functioned. I think— It's a business of obscuring. I think that when the government manufactures venue in a case like they did here, and you don't have any other evidence of any criminal conduct in the District of Columbia, I think it strains the Constitution to say that venue was proper. I know. I guess the problem I have with the manufacturing of venue argument is that if you are engaging in criminal conduct, and you are willing to do conduct with anybody who contacts you, and you don't know where in the heck that person is contacting you from, if you're doing business with them, then the government isn't manufacturing business venue. You're manufacturing venue by just doing business with whomever, wherever, however. I mean, I don't understand why we should be outraged or concerned about what the government did here. Tell me. I think the concern is erasing the Constitution's venue clauses in Internet cases by allowing unilateral government action without more, without any response—right? You're putting aside the jurisdeficiency argument, right? Just looking at it purely as a legal thing. Without any evidence of any response or knowledge on the part of the operator, assuming he's the operator, I think this is very dangerous because it creates universal jurisdiction for the prosecutor. They did business with this person. They didn't wait to transact business before inquiring, where are you? We don't want to do business with you unless you are in X location. I think the danger is that you're going to make a rule that mere Internet accessibility is going to constitute business for venue purposes. But let's say you have an Internet site that's defrauding people of money, and it reaches D.C. and only one person, and it bilks them out of a million dollars. Uh-huh. No venue in D.C.? Well, you would have an actual victim there. Do you have an actual victim in D.C., and it's not government-initiated action? But that's a generic assertion that a government agent posing is just because there's no actual harm. But that's a much broader assertion about the use of government agents in sting operations. I mean, there's all kinds of government agents posing as criminals and getting people who are disposed to deal with them to say they're going to deal with them. And day in, day out, we treat that as criminal action. If the person says, yeah, I want to commit a crime with you, let's meet tomorrow. So I'm not sure this is anything restricted to this kind of conspiracy. I think this case is unique in that there's, in all the other cases I look at like that, right, there's some kind of evidence of knowledge on the part of either the defendant or a co-conspirator. And what's really striking to me in this case, and I think one of the odd things about this case, is that there's actually like no corroborating evidence. Yes, circumstantial evidence counts, but when you go and you try to look and find anything that corroborates all these speculations, you're left wanting. I want to go back for a moment, just because I have an interest in this count three. You said that you argued that even if there were venue in D.C. for counts one and two, there isn't for count three, and you talked about business. And if I'm looking at the Blue Brief, you said there was no business conduct in D.C. It's at page 25 of the Blue Brief, 25 to 27, and you talk about there's no evidence of any business in D.C. besides the government agents mixes, the three government mixes in D.C. So if we found the government mixes to not be faulty for purposes of venue, do you have a separate argument for count three that the FinCEN registration requirement is inapplicable? I think that stands on that Mr. Sterling, or whoever wasn't operating a business in D.C., and it's not one of the things that was. So just for my purposes, since you're sorting out many, many issues in this case, if there is venue, because we accept the page transactions as having occurred in D.C., if there is venue for counts one and two, you don't have a separate argument that there's still no venue for count three? Outside of the fact that it's not business conduct in the District of Columbia? Those transactions were not business? Yes. They don't constitute, because business, at least to me, the common sense of the word is carrying on a business conduct in a given jurisdiction. Doesn't Page ask for the services of Bitcoin Fog to mix his cryptocurrency, and he gets it back? So he's done a business transaction, and I mean, I know you say that's a fake transaction, but I'm trying to say apart from that defect, the government, it's fake, it's not, the government's not a co-conspirator, but apart from those defects, is there any other reason why, that you've raised, why that FinCEN registration requirement wouldn't be applicable? Besides what's in our briefs, no, I don't think so, and I think there's, you know, there's the regulatory question that this is an area that wasn't even, there wasn't any guidance on from FinCEN until 2012, 2013, and really doesn't start to get regulatory scrutiny until really about 2016, 2017. And I would just like to point out one thing about the record to the court. You have this government mix in 2019. That's almost eight years after the acts that they attributed to Mr. Sterling off in registering the domain name. In that eight-year period, there's no evidence in the record of him operating Bitcoin Frog, and I think the problem, again, with count one's conspiracy charge is if that, if that isn't proper on count one, even if you find it proper on count two, if you just find it proper on count two, you have an $86 money laundering charge. The problem we have with count one is because of the conspiracy charge, then that brings in all the chain analysis reactor evidence. If count one, if any is not proper for count one, most of this case falls apart because most of the evidence is just co-conspirator statements or chain analysis reactors saying Silk Road in 2013 sent X amount of dollars to Bitcoin Frog and got Y back. Rebecca, I do see I'm over my time, your honors. As long as we have questions for you, we'll give you more time. On count four and venue, if Bitcoin Frog was required to file a registration document in D.C., why is the undisputed failure to make that registration not an element of the federal failure register as required by the federal statute, 1960B1B? Why isn't that sufficient to establish venue in D.C. under the federal statute? Well, the count four we're talking about in D.C. municipal money transfer. I'm sorry, but I'm actually really focusing here on count three and its interaction with the requirement of registration in any state. But one of the ways that one could violate the federal. Right. In 1960, and they state that in the indictment, I think, the violation of the D.C. municipal statute. I think if you have the violation of the D.C. municipal statute, then you are OK on count three. But I think the problem is there's zero evidence that Bitcoin Frog was operating in D.C. I think what's striking to me about the use of this D.C. municipal statute against somebody who was in Sweden at all, most of the relevant times is he's there's no evidence that Bitcoin Frog is actually operating in D.C. in terms of being a business in D.C.. I mean, if somehow I mean, what's remarkable to me is that the D.C. municipal statute is sort of being construed to have a global reach. I think it's that stretching it so far. You get into due process notice problems with it because there's no the servers weren't in D.C. There's no personnel in D.C. There's no communications in D.C. So I don't see how you can get a violation of a D.C. municipal money transmission statute on this record. I think mechanically, would you say logically, you know, assuming for the three? I think that's I think you're right on that. Right. I mean, what you're saying mechanically, if there is the money transmission, he didn't get the license in D.C. then you can use it as the predicate for for three in 1960. But I think the problem is, is that it's you're really just stretching the. You have to read the municipal statute in a creative way to say that, you know, Bitcoin Frog is operating out of D.C. I just I can't get that on a plain common sense reading of the statute. I don't think when it was passed, it was intended that way. I think it's just another thing that they're trying to use as a convenient hook to get money. No more questions. All right. Thank you. We will give you some time. Thank you very much. Nancy is the court Jenny Ellison for the United States. Sedition evidence supported the jury's any findings as to each count. And at the start, I'd like to say this is a sufficiency of the evidence question. And the question is whether the jury could have found by a preponderance of the evidence that venue was established. So I'll start with count to the substantive money laundering count and venue in this case for that account was driven, I think, largely by 18 U.S.C. in 1956. I three that specifically provides that a transfer of funds from one place to another. So constitute a single continuing transaction and any person who can who conducts any person that transaction may be charged in any district in which the transaction took place. So here are the relevant transaction with the transfer of Bitcoin from Bitcoin service wherever they were to agent price in Washington, D.C. And to address the representation that agent price made two days before Bitcoin fog sent those funds back. The jury could reasonably infer that Sterling saw that that message. I think the other there's ample evidence that supports the inference that he was the same person as his alter ego who was posting on Bitcoin fog. And that alter ego on Bitcoin fog would, you know, repeatedly touted this customer messaging function that agent price used to send the message. So on Bitcoin talk said we have been using this for all of our communications. I think the jury could reasonably infer that that was correct. I mean, Bitcoin fog is running a large scale international business. It received over time more than five hundred and twenty one thousand deposits of Bitcoin needed in order to keep its customers happy and to keep generating the money it needed to be responsive. I think you could also infer from other evidence in the record that Sterling off with somebody who spent the large majority of his time online. And Bitcoin fog was, you know, clearly a central focus of his life. And so the idea that this message would have gone two days unread, I think, is the jury could reject that inference and find the opposite. And then with respect to the conspiracy count, I think the agent prices transaction is the funds sent back to agent price. We're asking further into the conspiracy as were the status updates that Bitcoin fog transmitted back to agent price, kind of assuring him that things were going well, that payment was going through. These are things that Bitcoin fog communicates to people to, you know, again, raise confidence in the service. And, you know, when Bitcoin fog sent that transaction, Sterling off may not have known that it was going to D.C. But again, this is a large scale international operation. It was benefiting from the fact that the Internet allows you to engage in conduct in places that are geographically far from where you are personally, physically located. And I have a question again about counts three and four. So those counts are different because it's one thing to say you're operating on online business with global scope. And if you commit a crime through an online transaction, that crime is going to be subject to prosecution where part element of it occurs, where conduct necessary to show it or conduct that supports it occurs. That seems. Like a different point from the point that if you operate a money transmission business from Sweden and you do any transaction with someone in D.C. or anywhere in the United States, that one transaction is, even if the transaction itself, completely lawful. If you haven't registered with FinCEN before you do that, you're criminally liable under count three. If you haven't registered with the state authorities under the D.C. code, you're criminally liable for having done that one transaction. Is that your theory? I do think that the jury could reasonably infer that Sterling Ops and Bitcoin Fog were engaging in business and operating in D.C. I think it wasn't just the agent price transactions. Also, there was another undercover FBI analyst who conducted undercover transactions in 2016 as well. But you're not arguing that there's a two transaction threshold. I mean, is there a difference between engaging in a transaction that gives rise itself to criminal liability and conducting one transaction as the basis for, under the statute, conducting an unlicensed money transmitting business in D.C.? Like, when you think of, just in sort of common sense terms, when you think of needing to get a business license to operate in a place, it's a little bit more like that's where you're doing your business. That's where your business is cited, not where some of the transactions might touch, but where your business is cited. And, you know, there's some language in the D.C. code and in the federal statute that supports that. You know, no person shall engage in the business of money transmission in D.C., not do a money transmission transaction. Yeah, I understand what you're saying, but I don't think that the statutes require kind of a physical presence requirement. Not physical presence, even like a substantial, you know, nerve center or outpost or something more than just serving a customer who lives there and who reaches out. I mean, it's interesting that money transmission in the D.C. code refers to receiving money for transmission or transmitting money within the United States. In other words, the defendant would have to have received money for transmission within the United States, have to have been in the United States when the business received money or transmitting money within the United States. And the business did neither of those things, didn't transmit money within the United States, transmitted money from Sweden to the United States. So there's just a sense of like some kind of virtual or actual presence. So, I mean, if the U.S., if a U.S. business is sending, you know, doing a money transaction with Azerbaijan and Azerbaijan said, if you're not registered, you have, you know, you have a million dollar criminal penalty. Really? That's the position of the United States, that that's completely fine, consistent with due process, consistent with the venue of the cause of the prosecution? Well, I think that the jury could here infer that BitcoinFog was, that it wasn't just these two transactions. Maybe, you know, D.C. aside, if we're looking at the United States with the FinCEN requirement, if you have an international business that is doing 521,000 deposits and 693,000 withdrawals, you know, he is posting in English on BitcoinFog. He, I think in his exploit post, which he made under his own name, he refers to the fact that you can use TOR to evade even U.S. law enforcement, indicating that he understands that his service may be especially attractive to people of the United States. But I'd also like to just push back on the idea that count three depends on this court finding that he had a registration obligation in the United States and in D.C. I will say I don't understand him to have contested that in his brief. But even if this court decides to reach that issue under 18 U.S.C. 1960 B1C, that does not rest on kind of a formal registration requirement. That instead says that money transmitting business is unlicensed if it otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense. Right. So there is a piece in the federal statute that basically says there's no such thing as a licensed criminal transaction. And so if you're engaged in a criminal transaction with the United States, then under FinCEN you're unlicensed. I get that. You don't have that theory for the D.C. requirement. For the D.C. requirement, that's right. The D.C. requirement is a registration license requirement. Yeah. And the D.C. requirement depends on engaging in the business of money transmission, which is defined as receiving money or transmitting money, receiving money for transmission or transmitting money and doing that activity in the United States. Yes. I do think it's a practical matter that it is, in fact, incumbent on businesses that are engaging in money transmitting business throughout the United States that they, in fact, register in the states in which they're operating. I suspect that PayPal has registered, you know, basically everywhere in the United States that they would be required. And also everywhere in the world. I don't know. I don't know, you know, about that. I'm certainly not an expert in international law. But I think that it is something that, you know, this is somebody who's running an Internet business and is reaching into the United States and is doing business with United States customers. I think they are subjecting themselves to U.S. law, to state law, to D.C. law. So is that right? If I'm running a bank in San Antonio, Texas, and some of my customers use Zelle or Zelly, I never actually know how that's supposed to be pronounced, to transfer money and some of the customers are in D.C., then my San Antonio-based bank has to file for a D.C. money transmission license before I can deal with that Zelle transaction? Yeah. Again, I don't want to kind of give business advice to the business in San Antonio, but I do think here the jury found an on instruction. We don't know what the pattern of conduct is with respect to banks within the United States or money transmission businesses in the United States, whether they have every state and local license that they could possibly have. I have, I understand informally, this is, you know, I have looked into this a little bit informally and I understand that the big money transmitting, if you're engaged in money transmitting, it is common to, you know, seek registrations everywhere and that some businesses find some jurisdictions sufficiently burdensome that they, in fact, avoid doing business with customers in those jurisdictions because they don't want to have to comply. And that is something that obviously Bitcoin Fog, if Bitcoin Fog had any aversion to doing business in the United States for doing business in D.C., they could have asked the very kinds of questions of their customers that legitimate businesses, Bitcoin businesses do to try to find out more about them and where they're operating. And this again goes to the idea, I think, that there's no manufactured venue here because Bitcoin Fog was open to all comers, even if manufactured venue is a viable theory. And I would like to, you know, I know this court, we've moved on from counts one and two, but with respect to the role of the agents and all of this, I think this court's decision in the United States versus Sitzman from 2018 is quite analogous to what happened here with the role of the agents. The agents being the initiator of a wire from Florida to D.C. where the agent asked the co-conspirator of the defendant to send the wire. I'm sorry, it wasn't an agent, it was an agent asked a cooperator in D.C. to ask the wire to be sent to D.C. and the co-conspirator did. That seems analogous to the situation here. But I do want to make sure that I've answered the court's questions with respect to counts three and four also. So if the court has further questions about that or about the other issues in the case, I'm happy to address them. I'm going to ask you briefly about the Mazars expert testimony.  Who said it was likely, when comparing the IP addresses, that it was likely the same user using both accounts based on the overlap? What was the reliable basis for that conclusion that was likely? I didn't see testimony about how rare the number of overlaps is, how ordinary, you know, how many overlaps are there when there's ordinary folks doing it. They're still separate, but they're on the same VPN or Wi-Fi or whatever. What was the basis in the record for that? It was likely that these two were the same person. Well, I think there were four times where she gave testimony that was similar to that. And at least one or two of the times she did provide some information for why she—some additional basis for explaining. I think once she said when it was only a minute apart, she said, you know, the fact that these are only a minute apart and they're both cryptocurrency exchanges, that seems to me that it's likely. And then another time, it was when it was an IP address that logged into the Shoremen Liberty Reserve account, and then the Sterling Ops Liberty Reserve, and then the Shoremen account again. And she said that that's sandwiching. So those were some of the things that she was pointing to, these additional factors to suggest that it was likely. It likely assumes some sort of baseline understanding of what are the chances that that could happen by chance. It just happens in the universe. And so likely is a comparative term, and normally when you hear that testimony from an expert, there's some baseline as to, you know, ordinarily you don't see this type of overlap. You know, it's one in a thousand times you can have this kind of overlap, and it's not the same person. But there's nothing like that here. There's just no framework for the likely conclusion. She sort of spells out, here's some facts I saw, and so they must be likely because I saw these facts. And that seems to me the type of thing that Daubert might have very much been, is that Daubert? I might have that wrong. But Daubert might have been designed to prevent someone coming in and saying, I saw A, B, C, D, and E. And in my view, that's a likely thing without any framework for reference. I think that when she talked about how quickly IP addresses cycled, IP addresses are a different type of cycle, and I think the fact that the accounts had this connection, I think this is something that the district court could reasonably conclude would go more to weight than admissibility. And certainly, Sterling F. cross-examined her extensively about the fact that multiple. There definitely was cross-examination on that. But the whole point of the Daubert gatekeeping function is that we don't let everything in and let it all be argued about weight. There has to be some at least reliable basis for the conclusions. Something reliable enough that we can tell the jury this expert is an expert and is giving you information based on expertise. And I'm still struggling to understand. And the most important part is not just I saw this happen, this happen, this happen, this happen. That's like witness testimony. The expertise was in her conclusion then. It was likely that they were the same person. And so I'm going to repeat myself here, but I don't know how we know what was likely or not. She gave no information. And I get there was cross-examination on that, but should it have been let in the door anyhow? That's the point of the Daubert process. Yes, and I guess what I can point you to is in her Daubert testimony when she talks about the different types of IP addresses and how quickly they cycle. But I agree with you, you know, that the record is what it is. If this court has concerns about the reliability of that, you know, small piece of her testimony, I think it was only, you know, she had four fairly quick opinions. Most of her testimony, even on the IP addresses, was just describing what the data said. That's my point. The expertise, I mean, anyone could sort of say it's like fact witness. Here's these transactions I'm seeing. And the expertise is in the conclusion, the culling of the information into a conclusion. And it was, this was your evidence on identity. Oh, I disagree with that. I think there was substantially more evidence on identity than this. I'm happy to kind of.  Oh, yes. Oh, yes. I'm happy to walk through. So before Mazars even testified, the jury had already heard about the layering transactions that went from Sterling Offs' own financial accounts to purchase the domain name associated with Bitcoin Fog. That tracing was done, that came in both through Agent Leo Rabinsky's testimony and through Luke Scholl's testimony. The fact that he made the first deposit into Bitcoin Fog before Bitcoin Fog was even announced and that he did that from his personal account, that was also evidence had nothing to do with the IP addresses. He made additional early deposits into Bitcoin Fog through these layering transactions. Also, and this doesn't relate to any IP address expertise, on the same day that he, as the jury could infer, that he purchased this domain name, an IP address in Gothenburg, Sweden, where he lived, accessed the Shoreman Liberty Reserve account. That's just a fact. That's not opinion testimony. That is something that Mazars addressed in her testimony, but it's just saying what the IP address record said. There's also the fact that he, through his personal Bitcoin Talk account, engaged in communications with the owner of Blind Bitcoin about a month before he actually launched Bitcoin Fog about wanting to acquire Blind Bitcoin. And then later, his alter ego on Bitcoin Fog references how he'd been following the Blind Bitcoin project. He also had his exploit messages under his personal account where he was encouraging the use of Silk Road, touting Tor for privacy. He told a friend five months after Bitcoin Fog launched that he gave up a side project because some other things were yielding more cash. And then there's all of the financial information about how he had $1.8 million worth of Bitcoin that came into 40 different financial accounts, that he had $500,000 in Bitcoin on his phone, including much of that in an account called Straight Outta Mint. That account, in August 2020, received a $280,000 Bitcoin deposit directly from Bitcoin Fog. That's the appendix 39, 37 to 38. So none of that evidence had anything to do with Mazar's IP address opinions. Even the fact that there were some IP addresses that were common IP addresses for these layering transactions, it's just a fact that those were, you know, that one minute one logged into one account and then the next minute it logged into another account in the chain. And a jury who sees that evidence is going to draw the common sense inference that, you know, given all of these facts, that that is further evidence that it was sterling off controlling both accounts. Isn't it the case that all of that factual evidence would be clearly admissible and really what Mazar's was doing was just kind of connecting dots between clearly admissible factual evidence? Yes, I think there's no dispute that the underlying IP address log information would be admissible either way. That wasn't opinion testimony. She was just basically putting before the jury, he logged into this account and then he logged into this next account in a transaction or the same IP address logged in one minute later. You know, even if this court has concerns about the reliability of that kind of very small sliver of what she said, I think, you know, the jury probably would have drawn the same inference based on common sense and, you know, what people generally know about IP addresses. She educated them about what it all meant, that it was likely. Yes. That was part of maybe the pinnacle of her response. Yes, no, that's sterling off on cross examination. He pointed out all of the reasons why they should, you know, they could take a different view of the evidence and why in his view, they should take his view of the evidence and that these could be two completely unrelated people logging in. So, I think, I think that that, you know, the district court was, was, you know, within its broad discretion and determining that her testimony was reliable. How did the district court make that determination in this case? He heard her Gabber testimony and he, he didn't, he didn't specifically announce, you know, at any, he didn't, he didn't make a specific detailed ruling. Anywhere. But the fact that he allowed her to testify, and I believe he qualified her as an expert on these things. And so, I think that, that indicates. Where did he qualify her as an expert? I think I can't remember if it was the beginning of her trial testimony, but I think there, I think, you know, she, she was, she was admitted. He admitted her as an explanation for his conclusions as to reliability expertise. Yes, no, that's right. He didn't. There's also no objection at that point. Yes, there was no objection. And I think that, honestly, Ms. Ars was sort of a, she was, the focus of the expert back and forth was really on the reactor evidence and the blockchain analysis experts. And that was really where, you know, the parties and the court were focusing their attention. And I think Ms. Ars was, you know, it was, it was, it was, it was not something that was, that was a focus. There's definitely objection. There's a whole reason there was a Dauber hearing. She was put into the Dauber hearing, so they definitely objected to her expertise. Yes, but I, I don't, I don't take them even in their brief before this court, the briefing before this court to be raising the concern that Your Honor has raised about the opinion piece of it. The likely testimony that I, what I understand their objection to be is her views of these overlap windows, which were really just something she used to filter the data. And I don't, I don't understand them to have raised this, this different objection that Your Honor has, has raised. So, I think, you know, the court did want to go there. I think it would be a plain error and perhaps, perhaps an issue that the court is noticing on its own. I see that I'm over time. I'm happy to answer more questions from the court if you have further questions. Why wouldn't the government want to introduce evidence about not just child pornography, extremely abusive child pornography? There's no good child pornography, but they're extremely abusive. Why would you even have to say the words child pornography? Why wouldn't you just say stipulate this is violated in federal law? This is a violation of federal law. Well, I think there was evidence that one of the things that we needed to potentially show is that he, that Sterling Off knew, or was willfully blind to the fact that that Quinn Fogg could be engaging in this kind of conduct. But again, I know the indictment is all about drug money. I mean, you didn't, the indictment isn't about money laundering for violations of federal law generically, or even different categories of violations of federal law. This is all about a drug money conspiracy. And then you come in at the end and you sort of say, well, you've got this explosive information here about a teeny tiny transaction. It wasn't, it was only money going out. It wasn't even money coming in that involved a federal offense that's not charged in the indictment. Well, I think it's absolutely toxic and nuclear when raised before a jury. So, I actually disagree with the idea that this wasn't covered by the indictment. This was offense conduct for count three going to the 1960B1C count, because that count required the government to prove that he was engaging in activity that we used to promote or support unlawful activity. And it didn't require specification in the indictment about what type of unlawful activity. So, the government could prove that. It doesn't mean arguments tie it to the jury solely for count three. They argue it generically. No, because I think it was also relevant to other counts. And I can walk through the probative value for the other counts as well. But I also want to push back on the idea that there was something, you know, very inflammatory. Of course. Of course. Everybody knows there is. That's why there was any limitation at all in the first place. But you don't even need to name this child pornography. We don't know why the government wants to do that, but it seems to be the very reason that it shouldn't be done in front of a jury. Well, child pornography was actually already in the case before the Welcome to Video Evidence came out. There was reference at one point way back that that money could come in. But, in fact, this money didn't come in. It only went out. No, but he did. In his exploit post, he wrote an exploit post not too long after Bitcoin was launched where he said that, you know, you can use TOR to purchase drugs and, unfortunately, child pornography. That indicated that was already in the case. He was conserving TOR. Yes, but it still, you know, shows that he had an awareness that the dark net was being used. I have an awareness of that. Everybody has an awareness of that. That's why there's a reason that those transactions are done on the dark net. But that seems to me not much of any justification at all for the decision to—it's not whether the evidence could come in for point three. The question is why the government wanted to reference it as child pornography. I think as a factual matter, that is one of the types of illegal conduct that he was furthering. But I think that— All you needed to say was there was a stipulation. All you needed to say was it was a violation of another federal law. I think that the connection— Made the connection that would have satisfied count three. You could have argued, see, here's another instance that the timing of it is more recent. I think the connection to the exploit post meant that the specific type of criminal conduct was relevant. But also the fact that the reference to child pornography kind of stripped of any details, I think, really, you know, made the evidence kind of not that inflammatory. And certainly sterling up repeatedly— It was argued by the government to the jury. It was— It is part of the— It was recounted. It's part of the story of what Bitcoin Fog was doing. And I think it was also, you know, when— Sterling up certainly in his cross-examination and in his arguments, he did underscore the fact that this was a small amount of money and that it only came out. That I think the jury would have weighed that against the fact that Bitcoin Fog had taken tens of millions of dollars from drug dealers. I think, you know, some jurors might be, you know, much more bothered by the drug conduct than by this small amount of money going out to a child pornography website. And the fact that, you know, because of the party's stipulation, the exhibits could not be more anodyne. There's nothing inflammatory at all about the exhibits. And, you know, I'm not even sure if there was an objection the first time that the fact of child pornography was mentioned in connection with Welcome to Video, or if it was just that the objection came in when it was going to be the exhibits and that the focus was really on the exhibits. So I'm not sure that, you know, it was the idea that child pornography kind of writ large was the problem. I think that the objections that the defendant was focusing on at trial were really that there was something about the titles and descriptions on these spreadsheets that created a problem. And that was what the district focused on, and the government, you know, agreed to redact that material. It wasn't the idea that kind of any mention of child pornography. One more question. Sue, do you have any questions? I just want to circle back one more time to the venue. So the theory is that agent crisis transactions show continuation of a conspiracy. Given that all of the conspirators listed in the bill of particulars had ceased to exist outside the limitations period, what is the evidence in the record as to with whom Mr. before July 2017 just because of the success that law enforcement had in shutting down some of these dark markets. But the jury could infer that basically when one dark net market goes down, another one pops up in its place. That's what happened with Silk Road and Silk Road 2.0. And, in fact, there was at least one of the distributors on Silk Road who appeared to have migrated to the Silk Road. That was all before the jury? Yes, that was in front of the jury. How much evidence was there that replacements, either smaller ones grew or new ones came on before the jury? Yes, so the jury did hear the evidence about the specific Silk Road users and then the shutdown of Silk Road and then the evidence of the Silk Road 2.0 users. And I believe there was at least one person who appeared to be the same. They had the same username, something like that. And so the jury could infer that basically the individual vendors on these dark net markets, they're not going away just because a particular dark net market shuts down. They're going to find another way to distribute their drugs on the dark net. And they're going to continue to use Bitcoin Fog because Bitcoin Fog is an effective way to hide their drug money. And just for my ignorance, was the Silk Road only drugs or was it just general criminality? I think it was known the most for drugs, but they had all sorts of— You have to show a continuing drug conspiracy. Yes. It was principally drugs, but they also had, I think, other types. The continuation was based on the fact that there was what you called a Silk Road 2.0 doing transactions on Bitcoin Fog? Yes, and so these were users whose funds were being traced into Bitcoin Fog. And the government presented evidence about what they were selling on Silk Road and Silk Road 2.0. And, again, all of that evidence predates the 2017 date that is at issue for the statute of limitations. But, again, I think that the jury heard testimony that the dark net is a place where people are selling illegal drugs. And I think the jury could reasonably infer— Did you identify a new conspirator that was within the statute of limitations period? I'm not sure. I can't think of one, but I don't think that that was required because, you know, a conspiracy charge can be with people known and unknown to the grand jury. And so the conspiracy can continue— Were they entirely unknown? There were no unknowns at this point. Well, I mean, I think there certainly was the conspiracy. And, again, also, just to bracket this, that none of this is a concern that I understand Sterling ought to have raised. He definitely talked about how—he definitely raised this issue. I mean, people tell me if I'm wrong about how all the conspirators, they're named—he did it again this morning. All the conspirators that are identified were out of business before, you know, outside the statute of limitations period. And so the government's theory is that the conspiracy that's within the statute of limitations, the conspiracy can be lawfully charged as entirely with unknown conspirators. I think that it's—I'm not sure that—I can't think of anybody from the Bill of Particulars who—where the evidence came in that it was after— And there was no evidence of replacements, actually. Again, you talked about replacements, but not within the statute of limitations. And you didn't talk about any replacements that would have been putting money into—that could be— I mean, I think what we know is that Sterling Opp was continuing to run the money law. Well, no, he was continuing to make—Bitcoin Fog was continuing to still make a lot of money. We know that. But this is a conspiracy. And so is there authority for having the conspiracy be just with unknown? Well, I think— Unidentified— I would also say that I don't think that there is any evidence that—and I don't think Sterling Opp has attempted to present any evidence that any of those conspirators where the evidence is from before 2017, that any of them withdrew from the conspiracy. So in order to show that somebody left a conspiracy, you have to show some kind of withdrawal. And they just don't exist. I mean, these are businesses. These aren't human beings. What if they just don't exist? Well, but some of them were, you know, the individual vendors who were happening to use certain dark net markets as the platform for selling drugs. But that doesn't mean that they didn't then migrate to— That's sort of government's proof here on statute of limitations. You've got no—you can't think of any record evidence within the statute of limitations period of an identified— Well, I— —conspirator. For the drug conspiracy? I mean— For the drugs, because that's what's charged in the indictment. I think that one thing that—I think what this—obviously, Agent Price is not a conspirator. But I think Bitcoin Fog's handling, you know, continued willingness to launder that transaction, believing him to be kind of potentially a new conspirator. He's not a conspirator. No, he's not a conspirator. But I think it's, again, kind of information that allows the jury to draw this inference. And certainly, I think that the fact that Bitcoin Fog was still making so much money when so much—it had gotten so much money from these dark net markets before, I think, is an indicia. If its business—if its profits, you know, kind of still remained fairly high, I think that's an indication that it's operating in the same way that it always was with these customers coming in. Are there cases—because this is—some of this, I think, is sort of the product of the more modern era of crime commission on the Internet. Are there cases where all of the known conspirators are outside the limitations, period, and no others are identified? It's all unknown after that. I think it says that's okay that you're aware of. You know, I think that there certainly are conspiracy prosecutions where the government's never able to identify who in the real world the conspirators are because they have used the Internet to kind of pull back, you know, child pornography conspiracies. Often, a defendant will be conspiring with a lot of people on the Internet, none of whom can be identified because they've hidden who they are in various ways. So I think that this would be—that would be probably the best analogy that I can draw. Thank you very much. Mr. Ecklund, we'll give you the three minutes you asked for. Everyone in this courtroom that is using the Internet right now is probably on the same IP address. That obviously doesn't make us the same people. And Judge Millard, I think you made a very good point about computer scientist Mazarin, as she was introduced to the jury as a computer scientist, has no basis for making any kind of probabilistic determination as to whether or not Mr. Sterlinghoff was more or less likely to be using these email addresses that they attributed to him solely through computer scientist Mazarin's novel IP overlap analysis. She admits that thousands of people could be using the same IP address. Your argument in your brief to us is not about this likely explanation that she gave. If you argue that it's unreliability that she was relying on information from, I think, the IRS, yes, IRS data, and then you argue a lot about the UTC, coding it in UTC time, whether that was reliable. But I don't recall you arguing to us that this was impermissibly admitted expert testimony because of her categorization of the probabilistic categorization that she provided to the jury. But I was curious about that. Well, we did cross around her error rate. And she said, I can't tell you my error rate. I can't cite any scientific peer-reviewed paper that this is accurate. This is the first time that I've done that. I think it follows from that the fact that you can't calculate a problem. It follows from that what you cross-examined a witness on at trial that you have raised a legal argument about the basis for her probabilistic prediction or characterization in your court of appeals brief. I would submit to the court I have because you can't calculate any kind of probability if you don't know the error rate. And I think that goes to its unreliability. And I think that's a core issue in this case across the Daubert, however you say it. You can know error rate. That's how you decide what the probability is. And that's what you were cross-examining her on. I'm talking about the sort of comparative evidence that you would want to know what's likely or not. The problem, I think, with her ad hoc methodology is that there is no way looking at it to make that determination. That's what I understood you to be getting at. That, to me, seems plain from its face, right? I don't know what more to say beyond what we said. It's unscientific. It's, you know, what we said. But I would like to address something with a response to what the government said. I think computer scientist Mazarin's testimony, expert testimony, overlap analysis is central to the identification. That trace that they referred to in 2011 where Mr. Sterlingoff allegedly purchases the domain name for the ClearNet website, that's entirely dependent on attributing control of accounts to Mr. Sterlingoff based on computer scientist Mazarin's IP overlap analysis. I think it's the second Mt. Gox account and then the third big account in that chain. It's very, very convoluted. This notion that there's an independent evidence IDing Mr. Sterlingoff outside of Ms. Mazarin's IP overlap analysis, I dispute. I don't see it anywhere. I think their case in terms of the identification turns entirely on her novel IP overlap analysis. I don't see how you get any identification of Mr. Sterlingoff as after Ms. Schechter and the data, as the person all the way at the end of this purchase of a domain name registration in Sweden in 2011 without that analysis. I think the fact that the gatekeeping function of the district court didn't keep her out, and she was put in front of the court as a computer scientist with all the authority of the FBI in this very, very confusing case that's almost entirely built on expert testimony, no eyewitnesses, no victims, no corroborating evidence anywhere. The government never bothered to get Mr. Sterlingoff's computer from his apartment in Sweden. Okay. I think that's a real legal argument before us. Do my colleagues have any more questions?  Thank you, Your Honors. Thank you very much. The case is submitted.
judges: Millett; Pillard; Wilkins